# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57049-1-II |
| Respondent, | |
| v. | |
| TERRENCE CHRISTOPHER HERNDON, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, A.C.J. — Terrance Herndon appeals his conviction of felony murder in the second degree predicated on assault in the first degree and assault in the second degree. Herndon had two prior assault in the second degree convictions. The trial court sentenced Herndon to life without the possibility of parole under the Persistent Offenders Accountability Act (POAA), RCW 9.94A.570. Herndon asserts that his conviction must be reversed and remanded for a new trial because: (1) the prosecutor committed misconduct by arguing an entirely new theory of guilt on rebuttal and misstating the law on assault; (2) the court did not provide the jury proper self-defense and defense of property instructions, which relieved the prosecution of its burden of proof, or in the alternative, Herndon's counsel was ineffective for failing to request those instructions; (3) one of the court's instructions patterned after WPIC 26.04.01[1] improperly commented on the evidence which relieved the prosecution of its burden of proof; (4) Herndon's sentence is cruel punishment

---

[1] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 26.04.01, at 241 (3d ed. 2008).

because the POAA under which he was sentenced is imposed in a racially disparate manner; and (5) a $500 crime victim penalty assessment (CVPA) imposed as part of his sentence should be stricken under a recent change in the law.

In his supplemental brief, Herndon alleges that the recent United States Supreme Court case, *Erlinger v. United States*, 602 U.S. 821, 144 S. Ct. 1840, 219 L. Ed. 2d 451 (2024), requires a jury to determine that his prior offenses occurred on separate dates and because the judge made that determination in his case, his sentence should be reversed.

Lastly, Herndon makes several arguments in his statement of additional grounds for relief (SAG).[2]

We hold that (1) the prosecutor fairly responded to defense counsel's argument in rebuttal and did not misstate the law; (2) the trial court properly instructed the jury as to self-defense; (3) Herndon was not entitled to a defense of property instruction; (4) the WPIC 26.04.01 instruction was not a judicial comment on the evidence; (5) Herndon's arguments regarding the constitutionality of the POAA are not preserved for appeal; and (6) the CVPA should be stricken. We further hold that *Erlinger* does not invalidate Herndon's sentence and that none of Herndon's SAG claims warrant reversal.

We affirm Herndon's felony murder in the second degree conviction and sentence, but remand for the trial court to strike the CVPA.

---

[2] After Herndon filed his opening brief, the State filed a motion to strike the appendix to the brief, which a commissioner of this court denied. The State filed a motion to modify the commissioner's ruling. Because the materials in Herndon's appendix relate to a matter not preserved for appeal, as addressed later in our opinion, the State's motion to modify is denied as moot.

FACTS

I.    BACKGROUND

At trial Herndon testified that he was residing in a homeless encampment in Fife. Herndon bought two Amazon gift cards for his son's and grandson's upcoming birthdays. One morning, he planned to go eat at a nearby fast food restaurant and asked Christopher Smith, who was also residing in the encampment, if he could leave his backpack containing one of the gift cards in Smith's tent. Smith's niece was also staying in the tent.

When Herndon came back about 10 to 15 minutes later, he noticed that his bag was not inside the tent. Concerned, Herndon sat down in the nearby parking lot and waited for Smith. When he finally appeared, Smith was carrying a shovel. Herndon called out to Smith and said he was looking for his backpack. Smith swore at Herndon, flipped him off, and kept walking.

According to Herndon he tried to catch up with Smith. When he did, Smith said that he did not have Herndon's backpack and to "back up." Rep. of Proc. (June 2 2022) at 874. While confronting Smith, Herndon noticed Smith's niece sneak past him toward a motel. Herndon knew that people often sold stolen goods at the motel. He thought that it was possible that Smith's niece was trying to sell the Amazon gift card from Herndon's backpack. Herndon told Smith he was not going to do anything, but said he knew where Smith's niece had gone and asked Smith to get him back his gift card. Smith swore at Herndon and said he was not giving him anything. Smith swung the shovel at Herndon, who turned; the shaft of the shovel hit his elbow. At this point, Herndon tried to punch Smith but Smith had fallen backward. Herndon punched Smith repeatedly until he realized that Smith was unconscious.

Two witnesses called 911: Atalina Taatiti, an employee at the motel, and Kenneth O'Keefe, a truck driver. Law enforcement and medical personnel arrived and took Smith to the hospital. The day after the fight, police arrested Herndon near the motel.

Initially, doctors determined that Smith did not need surgery. But after several days, Smith had not woken up as the doctors had expected him to. An MRI[3] revealed that Smith had dead tissue in his brain. Smith was placed on comfort care in late September and died on October 1, 2021.

The State charged Herndon with felony murder in the second degree (predicated on assault in the first and/or second degree), assault in the first degree, and assault in the second degree.

II.    TRIAL

During trial, the State admitted a surveillance video from the motel. The video was blurry but it appeared to show Herndon running toward Smith and Smith quickly backing up. The video showed a physical altercation between the two.

The State also played recordings of phone calls Herndon made while he was detained in the Pierce County jail. Herndon can be heard telling someone that Smith "swung the shovel like a bat and I blocked it" and "[i]t's like that ain't going to do shit. That's not enough." RP (May 26, 2022) at 523. Herndon explained that, "I was kind of walking him down. I was really forcing his hand" and Smith "got scared, swung [the shovel] and I was ready. And I blocked it. And then . . . I demo'd him, like I demo'd him. I wanted a reason to demo him and that was the reason." RP (May 26, 2022) at 523-24.

---

[3] Magnetic resonance imaging

In a different call, Herndon stated that he had "been trying to keep my cool until I thought my mom was dying. Once I thought [about] my mom . . . it snapped. Terminator, terminator. You feel me? And dude, he hit me with a shovel and I blocked it. And then it was terminator. I'll be back." RP (May 26, 2022) at 525. Herndon admitted to being the person speaking in the jail calls.

A.    Witness Testimony

Defense witness, Dr. Lawrence Levine, testified that Smith could have died merely from falling backwards, but also that the punches may have contributed to Smith's injuries. Dr. Levine testified that punching alone would likely have resulted in a "significant concussion" but because of Smith's "underlying unhealthy brain" the punches may very well have resulted in Smith being "compromised, significantly compromised." RP (June 1, 2022) at 730.

Dr. Seth Stankus also testified for the defense, and opined that he would expect a patient with Smith's injuries to survive, but could not say exactly what caused his death. Dr. Stankus testified that: "[t]he initial CT scan[4] that was done and the couple follow-up CT scans of the head showed acute hemorrhages. The MRI also showed that there had been multiple small strokes throughout." RP (June 2, 2022) at 833. Also, ischemic lesions and infarcts were seen on the MRI, and Dr. Stankus testified that these could be the result of numerous factors such as diabetes, but were unlikely to have been caused by trauma to Smith's head.

Herndon testified at trial as well. He told the court that Smith swung a shovel at him which he blocked with his arm, but that due to his military background, his fight response was activated and he started to punch Smith. Herndon testified that he only stopped when he realized that Smith was unconscious.

---

[4] Computed tomography scan

B.      Jury Instructions

The court adopted several of Herndon's proposed jury instructions. We address each relevant instruction as proposed by Herndon and adopted by the court.

1.      Self-Defense Instructions

Herndon proposed several versions of jury instructions based on WPIC 16.02. He proposed that the jury be instructed that murder is justifiable "when committed in the lawful defense of the slayer when: (1) the slayer reasonably believed that the person slain intended [to commit a felony] [to inflict death or great personal injury]." Clerk's Papers (CP) at 58. He also proposed a jury instruction that stated that "[i]t is a defense to a charge of [Murder, Assault] that the force used was lawful" which means that "force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offence against the person." CP at 65.

Similarly, in instruction 20, the trial court instructed the jury that homicide was justifiable "when committed in the lawful defense of the slayer when: (1) the slayer reasonably believed that the person slain intended [to commit a felony] to inflict death or great personal injury." CP at 103.

2.      Assault Instruction

The trial court also adopted Herndon's proposed definitional instruction for assault in full. Instruction 11 states:

> An assault is an intentional touching or striking of another person, with unlawful force, that is harmful or offensive. A touching or striking is offensive if the touching or striking would offend an ordinary person who is not unduly sensitive.
> An assault is also an act, with unlawful force, done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.
> An assault is also an act, with unlawful force, done with intent to create in another apprehension and fear of bodily injury, and which in fact creates in another

6

a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

CP at 94; *see also* CP at 79.  The court also instructed the jury that, "A 'participant' in a crime is a person who is involved in committing that crime, either as a principal or as an accomplice.  A victim of a crime is not a 'participant' in that crime."  CP at 93 (Instr. 10).

Herndon requested that the jury use WPIC 17.02 in instructing the jury on self-defense on the felony murder charge.  The court adopted Herndon's proposed self-defense instructions with respect to the assault charges, which stated, in relevant part that,

> It is a defense to the charges of Assault in the First Degree . . . and Assault in the Second Degree . . . that the force was lawful. . . .
> The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.

CP at 108 (11 WPIC 17.02, at 282).

Herndon did not propose jury instructions regarding defense of property.

Finally, the court instructed the jury:

> The order of these instructions has no significance as to their relative importance.  They are all important.  In closing arguments, the lawyers may properly discuss specific instructions.  During your deliberations, *you must consider the instructions as a whole*.

CP at 84 (Instr. 1) (emphasis added).

C.      Closing Arguments

In its initial closing, the State also replayed the video footage, commenting that you can "see how quickly Mr. Herndon is running after [Smith].  You can count for yourself how many seconds it takes for Mr. Herndon to have [Smith] knocked over and start attacking him."  RP (June 2, 2022) at 901.

7

The State also discussed the common law means of committing assault: "[t]here are three ways technically [to commit an assault], and you have been instructed on three ways to commit an assault" including "an intentional touching or striking of another person that is harmful or offensive. . . . We know there was an offensive touching that was harmful or offensive, and we know it was intentional" and "creating apprehension or fear of another person. This deals with the conduct of Mr. Herndon when he's running up to Mr. Smith. . . . He's approaching at a fast rate of speed. He's gone up to him. He's provoking him. He's trying to start a fight with him. This is that type of a conduct." RP (June 2, 2022) at 906. "There are three ways technically, and you have been instructed on three ways to commit assault." RP (June 2, 2022) at 906.

Defense counsel's closing followed. They asserted that the prosecution had not demonstrated that Herndon did not act in self-defense or that Smith's death was a result of assault in the first or second degree. Defense reasoned that "hurrying after somebody does not make you a primary aggressor. Now, if he's running after him to try to provoke him into swinging the shovel at him, then potentially, yes, that would make him the first aggressor that wouldn't give him the self-defense." RP (June 2, 2022) at 950.

On rebuttal, the prosecution again argued that Herndon had assaulted Smith by approaching him "aggressively" causing Smith to fall back:

> There is no self-defense here. . . . You can see [Herndon] run on Mr. Smith. You can see Mr. Smith back up, and he's backing up, and he's backing up as [Herndon] is going and continuing to be aggressive towards him. And it's clear that he is the aggressor. There is no question.

RP (June 2, 2022) at 960.

The prosecution went on to argue:

> You know, the testimony of Mr. O'Keefe and of the hotel worker is fine, but you have it on video. You have the assault on video. I'd asked you in that video watch how [Smith] falls back. You know, were these injuries caused by the

8

punches? Were they caused by his fall back and hitting his head? It doesn't really matter. [Herndon] causes him to fall back. He's not walking along minding his own business. He trips and falls, injures his head, and then the defendant gets on top of him and starts punching him. He trips and falls, because he's backing away from the defendant.

When he's tripping and falling, he's backing away for some time, and then he does something, and it's not clear. He does appear to make some attempt to swing. Whether he makes contact or not, it's while he is backing away from Mr. Herndon, and it's Mr. Herndon who causes him to trip and fall.

And if you read the instruction on assault, there's a third definition, "with intent to create in another apprehension." There doesn't have to be contact for that assault. When he's coming aggressively towards him, and he's backing up, and he's coming aggressively towards him, that's the beginning of the assault.

And when he falls back and hits his head, and then he gets on top of him, that's a continuation of the single assault.

RP (June 2, 2022) at 961-62.

Defense counsel objected, and the trial court responded with a corrective instruction:

[DEFENSE]: Your Honor, I'm going to object to that as a misstatement of law.
THE COURT: Again, the jurors will rely on their collective notes and memory and also the Court's instructions on the law.

RP (June 2, 2022) at 962.

III.    VERDICT AND SENTENCE

The jury found Herndon guilty of felony murder in the second degree, assault in the first degree, and assault in the second degree. The assault convictions were vacated on the State's motion as a violation of double jeopardy.

The State asked the trial court to sentence Herndon under the POAA based on Herndon's criminal history. He had a 2008 assault in the second degree conviction and a 2011 assault in the second degree conviction. The court found that the convictions occurred on separate dates and counted as two strike offenses. The court determined that it did not have any discretion and was obligated to sentence him to life in prison without the possibility of release. The court imposed a mandatory life sentence and a $500 CVPA.

9

Herndon appeals.

ANALYSIS

I.    PROSECUTORIAL MISCONDUCT

Herndon argues that the State presented a new theory during rebuttal that Herndon first assaulted Smith by aggressively approaching him, and that this was a misstatement of the law constituting prosecutorial misconduct. The State argues that it fairly responded to defense counsel's arguments during rebuttal, consistent with the State's initial closing. We agree with the State.

Prosecutorial misconduct is grounds for reversal if "the prosecuting attorney's conduct was both improper and prejudicial." *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). Instead of examining improper conduct in isolation, we determine the effect of a prosecutor's conduct by examining that conduct in the full trial context, including the evidence presented, "'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). When the State's attorney misstates the law, this amounts to improper comments in the context of prosecutorial misconduct. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015); *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008). Statements by the prosecution (or the defense) to the jury upon the law must be confined to the law as set forth in the jury instructions. *State v. Estill*, 80 Wn.2d 196, 199, 492 P.2d 1037 (1972). "Generally, the prosecutor's improper comments are prejudicial 'only where there is a *substantial likelihood* the misconduct affected the jury's verdict.'" *State v. Monday*, 171 Wn.2d 667, 675-76, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007)).

A.    The Prosecutor's Statements Were Not a Misstatement of the Law

Herndon asserts several arguments to establish that the prosecutor's rebuttal was improper. First, he argues that the prosecutor's argument was a misstatement of the law because "[b]riskly approaching another person is not an assault." Br. of Appellant at 25. The State responds by arguing that an assault may be committed by creating apprehension and fear of bodily injury, so the comments were accurate.

Washington recognizes three common law definitions of assault: "(1) an intentional touching (actual battery); (2) an act done with intent to inflict bodily injury on another, tending but failing to accomplish it; and (3) an act done with intent to create in another apprehension and fear of bodily injury, and that in fact creates in another a reasonable apprehension and imminent fear of bodily injury." *Davis v. King County*, 16 Wn. App. 2d 64, 72, 479 P.3d 1181 (2021).

Under this third definition of assault, the State must prove the defendant acted with an intent to create a reasonable apprehension of harm. *State v. Austin*, 59 Wn. App. 186, 192-93, 796 P.2d 746 (1990), *abrogated on other grounds by State v. Walker*, 199 Wn.2d 796, 513 P.3d 111 (2022); *State v. Krup*, 36 Wn. App. 454, 458-59, 676 P.2d 507 (1984). This is an accurate reflection of how the jury in this case was instructed on assault: "An assault is also an act, with unlawful force, done with intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury." CP at 94 (Instr. 11). Because an assault may be committed by "creat[ing] in another apprehension and fear of bodily injury" and the prosecutor's comments comported with the law set forth in the jury instructions, the prosecutor's comments were an accurate statement of the law. *Davis*, 16 Wn. App. 2d at 72; *Estill*, 80 Wn.2d at 199. Moreover, assault is a continuing course of conduct crime. *State v. Villanueva-*

*Gonzales*, 180 Wn.2d 975, 984, 329 P.3d 78 (2014). Here, the continuing course of conduct could include both Herndon's backing Smith down until he fell and physically striking Smith. Accordingly, Herndon's contention is unavailing.

Herndon argues that *In re Personal Restraint of Arntsen*, 25 Wn. App. 2d 102, 522 P.3d 135 (2023), *rev'd*, 2 Wn.3d 716, 543 P.3d 821 (2024), stands for the proposition that simply directing intimidating conduct at someone does not necessarily establish sufficient evidence to support the requisite intent to support a conviction for assault. In that case, there was a road rage incident between a man and a young woman. *Id.* at 117. The man got out of his car, and while holding a rifle but not pointing it, ran up to the woman in the driver's seat of the other vehicle, then ran back to his own vehicle before leaving. *Id.* Witnesses testified that the man appeared to be "[s]cary aggressive." *Id.* at 118. Division One of this court held that this evidence was insufficient to prove specific intent by the man to create apprehension and fear of bodily injury. *Id.* at 117-19.

Notably, our Supreme Court reversed this court's *Arntsen* opinion, specifically holding that "sufficient evidence existed for the jury to find that Arntsen intended to cause apprehension of harm."[5] 2 Wn.3d at 726. The prosecution's argument was not a misstatement of the law.

Moreover, in arguing that there cannot be a conviction based on aggressively approaching Smith without more, Herndon raises a separate issue from whether placing another in apprehension of injury constitutes an assault (as set out above, it can constitute an assault). Instead, Herndon appears to be arguing the facts and circumstances in his case do not amount to an assault on this

---

[5] The court held that a rational trier of fact *could* have found the defendant's conduct evidenced intent to cause apprehension and fear of injury, considering all of the circumstances surrounding the confrontation, such as the defendant approaching and circling the young woman's car with a firearm in hand, and angrily forcing her to stop in the middle of the road. *Arntsen*, 2 Wn.3d 716.

apprehension theory. This is essentially a sufficiency of the evidence argument; Herndon did not assign error to the sufficiency of the evidence. In either case, his argument fails.

B.    The Prosecutor's Statements Were Not Improper Rebuttal

Herndon also asserts that the prosecutor's rebuttal was improper because he argued for the first time that the aggressive manner in which Herndon approached Smith constituted assault because that action caused Smith to fall down and hit his head. Herndon argues that this was improper because the prosecutor did not make this argument during his initial closing, and the prosecutor's theory throughout the case had been that Herndon had assaulted Smith by punching him while he was on the ground and that Smith died as a result.

The State argues that this was an appropriate response to Herndon's claims in closing, and the response was consistent with the jury instructions on assault. We agree with the State.

In closing argument, the prosecuting attorney has wide latitude to argue reasonable inferences from the evidence. *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). In general, a prosecutor's remarks, including those that would otherwise be improper, are not grounds for reversal where they are invited, provoked, or occasioned by defense counsel. *State v. Davenport*, 100 Wn.2d 757, 761, 675 P.2d 1213 (1984). Usually, as long as these remarks are aimed more at responding to defense criticisms than at finding additional reasons to convict the defendant, they are not improper. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). Further, there are no grounds for reversal where the comments are in reply to or retaliation for defense counsel's acts and statements, "'unless such remarks go beyond a pertinent reply and bring before the jury extraneous matters not in the record, or are so prejudicial that an instruction would not cure them.'" *Davenport*, 100 Wn.2d at 761 (emphasis omitted) (quoting *State v. LaPorte*, 58 Wn.2d 816, 822, 365 P.2d 24 (1961)). In other words, a conviction must be reversed only if there

13

is a substantial likelihood that the alleged prosecutorial misconduct affected the verdict. *Russell*, 125 Wn.2d at 86.

In *Davenport*, the defendant was charged with burglary. 100 Wn.2d at 758. The defense argued the State had not proved the defendant actually entered the home, and suggested that the defendant may have been handed the stolen property outside of the home. *Id*. at 758-59. In response, the prosecutor argued during rebuttal that this did not matter because this made the defendant an accomplice. *Id*. at 760-61. Our Supreme Court held this was improper rebuttal and was a statement of law not contained in the jury instructions because there was no accomplice liability jury instruction; instead, the prosecutor unilaterally presented the theory of accomplice liability to the jury. *Id*. at 760-63.

This case is distinguishable from *Davenport*. In that case, the State neither charged the petitioner as an accomplice nor sought an instruction on accomplice liability at the close of the case, yet nevertheless argued in rebuttal that it did not matter who entered the building as the petitioner was an *accomplice*. *Id*. at 760. Because accomplice liability is a legal theory of criminal liability, the court found that the comment was improper because that theory of liability was not contained in the instructions. *Id*.

But in the case before us, the jury was instructed on the "apprehension" definition of assault that the prosecutor described in rebuttal. CP at 94. Additionally, the prosecution mentioned the apprehension theory in the initial closing argument. The prosecution argued "[t]here are three ways technically [to commit an assault], and you have been instructed on three ways to commit an assault." RP (June 2, 2022) at 906. The prosecution described "creating apprehension or fear of another person. This deals with the conduct of Mr. Herndon when he's running up to Mr. Smith. . . . He's approaching him at a fast rate of speed. He's gone up to him. He's provoking him. He's

14

trying to start a fight with him. This is that type of a conduct." RP (June 2, 2022) at 906. Further, it was a contested issue throughout the trial whether the cause of Smith's death was from the fall alone, as allegedly brought on by the initial approach creating apprehension, or from the striking, or both; also contested was what other contributing factors there may have been. This is evidenced from the testimony of Dr. Levine and Dr. Stankus. This was not an entirely new theory unilaterally presented by the prosecutor to the jury for the first time in rebuttal, without instruction, as was the offending argument in *Davenport*. 100 Wn.2d at 763.

The prosecution was also responding to the defense argument that the assault did not begin during the initial phase when Herndon, by his own account, rapidly approached and was goading Smith into striking first. This argument was tied to the defense theory of causation—that Smith's death was caused by injury from the fall, not Herndon's initial approach or strikes; it was also tied to who, between Herndon and Smith, was the initial aggressor. The prosecution was justified in responding to the defense's arguments; the comments were not improper.

II.    JURY INSTRUCTIONS

A.    Self-Defense Instructions

Herndon argues that the jury instructions on self-defense were incomplete and incorrect, which in turn "unconstitutionally diluted the prosecution's burden of proof." Br. of Appellant at 34. Specifically, Herndon alleges that the court failed to provide the jury with complete self-defense instructions for the charge of felony murder in the second degree predicated on assault in the first or second degree. We disagree.

We review jury instruction errors based on legal rulings de novo. *See State v. Benn*, 120 Wn.2d 631, 654-55, 845 P.2d 289 (1993). Jury instructions are proper when they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the

applicable law. *State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005). Jury instructions that fail to inform the jury of an element of an offense relieve the State of its burden of proof. *State v. Weaver*, 198 Wn.2d 459, 465, 496 P.3d 1183 (2021). Appellate courts should determine on a case-by-case basis whether an unpreserved claim of error regarding a self-defense jury instruction constitutes a manifest constitutional error. *State v. O'Hara*, 167 Wn.2d 91, 101, 217 P.3d 756 (2009).

But "'[a] party may not request an instruction and later complain on appeal that the requested instruction was given.'" *State v. Henderson*, 114 Wn.2d 867, 870, 792 P.2d 514 (1990) (emphasis omitted) (quoting *State v. Boyer*, 91 Wn.2d 342, 345, 588 P.2d 1151 (1979)). The invited error doctrine prohibits a party from setting up an error at trial and then challenging that error on appeal. *Henderson*, 114 Wn.2d at 870.

Here, Herndon proposed several versions of jury instructions based on WPIC 16.02. He proposed that the jury be instructed that murder is justifiable "when committed in the lawful defense of the slayer when: (1) [t]he slayer reasonably believed that the person slain intended [to commit a felony] [to inflict death or great personal injury]." CP at 58. And that "[i]t is a defense to a charge of [Murder, Assault] that the force used was lawful" which means that "force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person." CP at 65. The trial court instructed the jury accordingly. Herndon assigns error to jury instructions that are similar to the ones he proposed. Under the invited error doctrine, we are precluded from reaching such issues. *Henderson*, 114 Wn.2d at 871.

16

B.      Defense of Property Instruction

Herndon argues that the trial court erred in failing to give a defense of property instruction. However, defense counsel did not propose such an instruction. Therefore, the trial court did not err in failing to give a defense of property instruction. *See Russell*, 171 Wn.2d at 124 (a trial court is not required to sua sponte give a jury instruction absent a request for such instruction).

C.      Ineffective Assistance of Counsel

In the alternative, Herndon argues that defense counsel was ineffective for failing to propose proper jury instructions. We disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that "'counsel's representation fell below an objective standard of reasonableness'" and "'the deficient performance prejudiced the defense.'" *State v. Bertrand*, 3 Wn.3d 116, 128 546 P.3d 1020 (2024) (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)) To show deficient conduct based on failure to request a jury instruction, the defendant must first establish that he would have been entitled to the instruction. *Bertrand*, 3 Wn.3d at 129. The defendant is prejudiced when there is a reasonable probability, that, but for counsel's deficient performance, the outcome of the proceedings would have been different. *Id.* The claim fails if either prong is not established. *Id.*

1.      Self-Defense Instructions

Herndon acknowledges that the applicable self-defense instructions were given to the jury regarding counts two and three, assault in the first and second degree without a deadly weapon. These were predicate offenses to the felony murder in the second degree charge, meaning that the jury necessarily had to find that Herndon committed assault in the first or second degree to commit

17

felony murder. The jury, in considering the correct standard under WPIC 17.02, found that self-defense did not apply to Herndon and returned a guilty verdict as to both assault counts.

In *State v. McCreven*, the defendant was also charged with felony murder in the second degree predicated on assault in the second degree. 170 Wn. App. 444, 467, 284 P.3d 793 (2012). The court in *McCreven* gave the jury an instruction patterned after WPIC 16.02, which the reviewing court determined to be in error because the underlying basis for the assault was not predicated on a deadly weapon. *Id*. The court of appeals held that the instruction did not reflect the proper standard for self-defense and lessened the prosecution's burden of proof in disproving self-defense because it raised the degree of threat of injury that the defendants must have reasonably perceived to act in self-defense, *id*. at 464, a more difficult standard to meet for self-defense, and conversely an easier burden to disprove.

Even assuming error, if we read the instructions as a whole and presume the jury followed them, any ambiguity is resolved. The jury, in considering the correct standard under WPIC 17.02, found that self-defense did not apply to Herndon and returned a guilty verdict as to both assault counts. Therefore, in reading the instructions as a whole, the jury considered the correct standard as to the felony murder charge by considering the correct standard for assault charges.

In this case, unlike in *McCreven*, the correct standard was given for the predicate offenses, so the arguably incorrect instruction did not raise the degree of threat of injury that Herndon must have perceived to have lawfully acted in self-defense. While instruction 20 could have been interpreted to require a higher degree of threat than necessary, instruction 25 explicitly informed the jury of the correct degree of threat. *See State v. McLoyd*, 87 Wn. App. 66, 71, 939 P.2d 1255 (1997). If there was reason to believe that jurors would disregard instruction 25, then the instructions when read together would not suffice. But Herndon does not make this argument and

18

we presume that jurors follow the court's instruction. *See Emery*, 174 Wn.2d at 766; *Weaver*, 198 Wn.2d at 467. Therefore, without any indication to the contrary, Herndon does not show that if defense counsel proposed different jury instructions, and those instructions were accepted by the trial court, the outcome would be any different. Therefore, he fails to show ineffective assistance of counsel.

2.      Defense of Property Instruction

In deciding whether a defense of property instruction should have been proposed, we must view the evidence in the light most favorable to the defendant. *State v. Fisher*, 185 Wn.2d 836, 849, 374 P.3d 1185 (2016). And the defendant can rely on any evidence produced at trial to support the defense, even if inconsistent with his or her own testimony. *Id*. at 849-51; *see also State v. Yelovich*, 1 Wn. App. 2d 38, 43, 403 P.3d 967 (2017).

In *Yelovich*, we considered to what extent a defendant can rely on defense of property as a defense when he or she uses force to recover property that already has been taken and is no longer in his or her possession. *Id*. We analyzed the plain language of RCW 9A.16.020(3) and determined that it establishes that an owner of property cannot use force to defend that property after the interference with the property has been completed. *Id*. at 44.

Based on the language of RCW 9A.16.020(3) and relevant case law, we developed the following test for when an owner of property *cannot* use force to defend the property: (1) the interference with the property occurs when the defendant was not present; (2) the interference has been completed and the property is no longer in the owner's possession; and (3) the property has been removed from an area within the owner's control. *Yelovich*, 1 Wn. App. 2d at 47.

Assuming that the alleged taking occurred as Herndon describes it, and reviewing the facts in the light most favorable to Herndon, application of this three-part test from *Yelovich* shows that a defense of property instruction was not appropriate. First, Herndon was not present when his backpack was taken; he discovered that the backpack was gone only after it already had been taken. *See Id.* Second, at that point Smith's niece had completed the taking and had possession of the backpack. *See Id.* Third, Smith's niece had left the area of Herndon's control and was seen close to the nearby motel. *See Id.* Therefore, the evidence shows that the theft of Herndon's backpack had already been completed when Herndon approached Smith. Herndon was attempting to recover the backpack, not to prevent its theft. There was no evidence to support a defense of property instruction.

Herndon argues that this instruction was necessary because he was entitled to confront Smith and use reasonable force to regain his property. Herndon reasons that "[i]t is well established under the common law that a person is immune from liability for the use of reasonable force to recover stolen personal property." Br. of Appellant at 41. However, Herndon faces criminal charges, and tort law is not pertinent here. Under the *Yelovich* framework, we disagree with this argument.

Accordingly, Herndon does not show that he was entitled to a defense of property instruction to establish defiant performance. Therefore, his ineffective assistance of counsel claim fails.

III.    COMMENTS ON THE EVIDENCE

Herndon argues that the trial court commented on the evidence and relieved the prosecution of its burden to prove the non-participation element of felony murder by instructing the jury that "a victim of a crime is not a participant in a crime." Br. of Appellant at 53. The State argues that

20

the trial court correctly defined the law for the jury by giving the WPIC 26.04.01 pattern instruction, and the statement was therefore not an improper comment on the evidence. We agree with the State.

A.    Legal Principles

A judge is prohibited by article IV, section 16 of the Washington Constitution from "'conveying to the jury [their] personal attitudes toward the merits of the case' or instructing a jury that 'matters of fact have been established as a matter of law.'" *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006) (quoting *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)). The purpose of this section is to prevent the jury from being influenced by knowledge conveyed to it by the trial judge as to their opinion of the evidence submitted. *State v. Jacobsen*, 78 Wn.2d 491, 495, 477 P.2d 1 (1970). Therefore, in keeping with this purpose, this provision only forbids words or actions that convey personal opinions regarding the credibility, weight, or sufficiency of evidence. *Id.*; *see, e.g.*, *State v. Galbreath*, 69 Wn.2d 664, 671, 419 P.2d 800 (1966); *State v. Louie*, 68 Wn.2d 304, 313-14, 413 P.2d 7 (1966).

In determining whether words or actions amount to a comment on the evidence, a reviewing court looks to the facts and circumstances of the case. *Jacobsen*, 78 Wn.2d at 495. An opinion of a trial judge can be improperly conveyed either directly or by implication. *See State v. Lampshire*, 74 Wn.2d 888, 447 P.2d 727 (1968).

B.    The Trial Court Did Not Comment on the Evidence

Herndon takes issue with instruction 10 that reads: "A 'participant' in a crime is a person who is involved in committing that crime, either as a principal or as an accomplice. *A victim of a crime is not a 'participant' in that crime.*" CP at 93 (emphasis added). Herndon asserts that this instruction effectively resolved, as a matter of law, element (3) in the to-convict instruction, i.e.,

21

whether Smith "was not a participant in the crime of either Assault in the First Degree or Assault in the Second Degree." Br. of Appellant at 57. According to Herndon, once the jury determined that Smith was a victim of assault in the first or second degree by Herndon, the jury was bound under the instruction to find that Smith was not a participant in that assault. By removing this factual issue from the jury, Herndon asserts, the instruction improperly relieved the prosecution of its burden to prove non-participation, making it a comment on the evidence. We disagree.

The instruction was patterned after WPIC 26.04.01[6] and properly reflects the general law surrounding felony murder. *See* RCW 9A.08.020(5)(a) ("[u]nless otherwise provided by this title or by the law defining the crime, a person is not an accomplice in a crime committed by another person if: (a) He or she is a victim of that crime.").

Consistent with RCW 9A.08.020(5)(a), we have held that the victim of an assault is not a "participant" in the assault for purposes of the felony murder statutes. *See generally*, *State v. Goodrich*, 72 Wn. App. 71, 75, 863 P.2d 599 (1993), *abrogated on other grounds by State v. Ramos*, 124 Wn. App. 334, 101 P.3d 872 (2004); *State v. Langford*, 67 Wn. App. 572, 579-80, 837 P.2d 1037 (1992); *State v. Brigham*, 52 Wn. App. 208, 210, 758 P.2d 559 (1988). In *State v. Carter*, 154 Wn.2d 71, 79, 109 P.3d 823 (2005), our Supreme Court explained that "it is clear that a 'participant' must either be a principal (i.e., one who actually participates directly in the commission of the crime) or an accomplice (i.e., one who meets the statutory definition of accomplice)."

The comments to WPIC 26.04.01 refer to *Brigham* to illustrate the distinction between a participant and a victim. In *Brigham*, the defendant and the victim were "engaged in an escalating

---

[6] That WPIC reads: "A 'participant' in a crime is a person who is involved in committing that crime, either as a principal or as an accomplice. [A victim of a crime is not a 'participant' in that crime.]" 11 WPIC 26.04.01, at 429.

physical conflict" with the victim the more aggressive of the two until the defendant produced a knife and stabbed the victim to death. 52 Wn. App. at 209. Brigham was convicted of felony murder in the second degree based on the underlying assault felony. *Id*. On appeal, the defendant contended that he could not be guilty of felony murder because the victim was a participant. *Id*. The court disagreed. "The facts also show that [the victim] was not a 'participant' in the assault upon himself; he may have started the fight which led to his death, but he was not a 'principal or accomplice' in the assault." *Id*. at 210. The court held that because the victim was not a participant, the omission of the nonparticipant element from the instructions was harmless error. *Id*.

Herndon argues that this instruction is not a correct statement of the law, specifically with regards to mutual combat where the victim consents or invites the fight that results in the assault. We disagree. This was a correct statement of the law as it relates to felony murder, per RCW 9A.08.202(5)(a), WPIC 26.04.01, and various case law. *See generally*, *Goodrich*, 72 Wn. App. at 75; *Langford*, 67 Wn. App. at 579-80; *Brigham*, 52 Wn. App. at 210.

In light of the aforementioned, instruction 10 did not consist of the court conveying its personal opinion on the merits of the case, or instructing the jury that matters of fact have been established as matters of law. *See Becker*, 132 Wn.2d at 64. We hold that the trial court did not comment on the evidence.

IV.     RACIAL DISPARITY IN SENTENCING

Herndon argues for the first time on appeal that his "three strikes" sentence of life in prison without the possibility of release is cruel and unusual punishment under the Washington Constitution and the Eighth and Fourteenth Amendments to the United States Constitution because it is imposed in a racially disparate manner and does not comport with evolving standards of decency. The State argues that Herndon cannot challenge the POAA for the first time on appeal,

that his claims are improper, and even if his claims were proper, his sentence is still appropriate under the *Fain*[7] proportionality test. We agree with the State.

The State is correct that, at sentencing, Herndon did not make any arguments regarding the constitutionality of the POAA, nor did he offer any study analyzing the potential racially disproportionate impact of such life sentences. A claim of error may not be raised for the first time on appeal unless it involves a manifest error affecting a constitutional right. RAP 2.5(a)(3). Therefore, Herndon "must demonstrate (1) the error is manifest, and (2) the error is truly of constitutional dimension." *O'Hara*, 167 Wn.2d at 98.

Herndon has not shown any manifest error. Rather, he relies on data and statistics that present a hypothetical error, not specific to him. This data was also not presented at sentencing, denying the trial court any opportunity to consider it, and denying the State an opportunity to contest it. Applicable case law shows that this kind of challenge requires thorough studies and specific data on the matter of disproportionality which is absent from the record before us. For example, in *State v. Gregory*, 192 Wn.2d 1, 12-13, 427 P.3d 621 (2018), the defendant commissioned a thorough study on the effect of race that was vetted and reviewed by a Supreme Court commissioner. Because such studies are absent from the record, and because this issue was raised for the first time on appeal, Herndon effectively foreclosed the opportunity for the State to rebut the argument.

Furthermore, as recently as 2019, our Supreme Court upheld Washington's POAA as constitutional. *State v. Moretti*, 193 Wn.2d 809, 446 P.3d 609 (2019). Prior to 2019, the Supreme Court held that "'[t]he life sentence contained in RCW 9.92.090 is not cumulative punishment for prior crimes. The repetition of criminal conduct aggravates the guilt of the last conviction and

---

[7] *State v. Fain*, 94 Wn.2d 387, 617 P.2d 720 (1980).

justifies a heavier penalty for the crime.'" *State v. Witherspoon*, 180 Wn.2d 875, 888-89, 329 P.3d 888 (2014) (internal quotation marks omitted) (quoting *State v. Rivers*, 129 Wn.2d 697, 714-15, 921 P.2d 495 (1996)). "Regardless of any personal opinions as to the wisdom of this statute, [the Court] ha[s] 'long deferred to the legislative judgment that repeat offenders may face an enhanced penalty because of their recidivism.'" *Moretti*, 193 Wn.2d at 830 (quoting *State v. Fain*, 94 Wn.2d 387, 390-91, 617 P.2d 720 (1980)). We defer to the legislative judgment again here, at least until the issue of racial disproportionality is properly before an appellate court for consideration.

For the aforementioned reasons, we decline to address the constitutional challenge Herndon raises for the first time on appeal.

## V.    *ERLINGER V. UNITED STATES*

In a supplemental assignment of error submitted after oral argument, Herndon asserts that based on *Erlinger*, the trial court erred by imposing a three strike life without parole sentence absent a jury finding of the fact of conviction of at least two separate most serious offenses and that at least one of these prior offenses "'occurred before commission of any of the other'" most serious offenses for which Herndon was previously convicted. Supp. Br. of Appellant at 7 (quoting RCW 9.94A.030(37)(a)(ii)). Herndon asserts this is a violation of the Fourteenth Amendment of the United States Constitution and article I, § 21 and 22 of the Washington Constitution.

The State responds that *Erlinger* does not disallow a judge from determining the fact of a prior conviction and recidivism. We agree with the State.

"The Fifth and Sixth Amendments placed the jury at the heart of our criminal justice system." *Erlinger*, 602 U.S. at 831. The Fifth Amendment dictates that no "person shall be deprived of life, liberty, or property without due process of law." U.S. CONST. amend. V. The Sixth Amendment guarantees a criminal defendant "speedy and public trial, by an impartial jury."

U.S. CONST. amend. VI. Generally, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proven beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). There is, however, a narrow exception. *Id.*; *Erlinger*, 602 U.S. at 838. A sentencing court may consider "'the fact of a prior conviction'" so long as it determines only "'what crime, with what elements, the defendant was convicted of.'" *Erlinger*, 602 U.S. at 838 (quoting *Alleyne v. United States*, 570 U.S. 99, 111 n.1, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013); *Mathis v. United States*, 579 U.S. 500, 511-12, 136 S. Ct. 2243, 195 L. Ed. 2d 604 (2016)).

While Herndon asks us to hold that *Erlinger* requires reversal of his sentence, *Erlinger* is inapplicable because the United States Supreme Court limited its holding to the "occasions inquiry" for determining prior firearm offenses under the federal Armed Career Criminals Act (ACCA). 602 U.S. at 835 ("While recognizing Mr. Erlinger was entitled to have a jury resolve ACCA's occasions inquiry unanimously and beyond a reasonable doubt, we decide no more than that."). Indeed, the Court expressed its desire to limit the breadth of the fact of conviction exception, even isolating its opinion in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), which allows judges to determine the "fact of conviction," as "'at best an exceptional departure' from 'historic practice.'" *Erlinger*, 602 U.S. at 837 (quoting *Apprendi*, 530 U.S. at 487). But in spite of its expressions, the Court did not overrule *Almendarez-Torres*. *Id.* at 838. We take the Supreme Court at its word and hold that *Erlinger* has no application here and that *Almendarez-Torres* continues to allow a judge to determine the "fact of conviction."

Further, our Supreme Court's decision in *State v. Wheeler*, 145 Wn.2d 116, 34 P.3d 799 (2001), is on point. In *Wheeler*, our Supreme Court concluded that "traditional factors considered by a judge in determining the appropriate sentence, such as prior criminal history, are not elements

of the crime." *Id*. at 120. The court continued, "[a]ll that is required by the constitution and the statute is a sentencing hearing where the trial judge decides by a preponderance of the evidence whether the prior convictions exist." *Id*. at 121. Wheeler has not been overruled. And as Division One of this court recently held, *Erlinger* "is limited to resolving ACCA's occasions inquiry and does not overrule our state's well-established precedent." *State v. Anderson*, 31 Wn. App. 2d 668, 681, 552 P.3d 803, *review denied*, 3 Wn.3d 1034 (2024).

Accordingly, the trial court did not err in determining the fact of conviction regarding Herndon's prior qualifying most serious offenses justifying his life without parole sentence. Based on our holding, we need not reach the parties' arguments regarding harmless error.[8]

VI.     STATEMENT OF ADDITIONAL GROUNDS

Herndon's statement of additional grounds raises seven additional claims that he argues support reversal of his conviction. We conclude that none of these claims warrant reversal.

A.      Matters Too Vague to Address

RAP 10.10(c) does not require an appellant to refer to the record or cite authority in a SAG, but the rule does require an appellant to inform this court of the "nature and occurrence of alleged errors." The following assertions are too vague to properly inform the court of the error.

---

[8] We note that Herndon filed a subsequent statement of additional authorities citing a United States Supreme Court order in *Fields v. Colorado*, US Supreme Court Docket no. 24-5460 (Jan. 27, 2025), where the Court stated, "The motion of petitioner for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted. The judgment is vacated, and the case is remanded to the Court of Appeals of Colorado for further consideration in light of *Erlinger v. United States*, 602 U. S. 821 (2024)." Without an opinion providing us with an explanation for the Court's order or legal precedent to follow, we find this additional authority to be unhelpful.

In SAG 3, Herndon asserts that the prosecutor made improper remarks by suggesting the punches thrown were in the double digits "when there is a video that doesn't show that." SAG at 3. But Herndon does not explain the nature of this alleged error and how the difference between nine or ten punches changes the outcome of his trial.

In SAG 5, Herndon asserts that there is no proof he was ever offered any plea deal in lieu of his life sentence, but he does not explain the nature of this occurrence or why this fact is grounds for appeal or reversal.

B.    Matters Outside the Record

On direct appeal, we may consider only facts contained in our record. *State v. Estes*, 188 Wn.2d 450, 467, 395 P.3d 1045 (2017). Matters that rely on facts outside our record are best raised in a personal restraint petition. *State v. McFarland*, 127 Wn.2d 322, 338, 338 n.5, 899 P.2d 1251 (1995).

In SAG 4, Herndon asserts that Dr. Stankus, who testified on his behalf at trial, is a veterinarian and not a human doctor. This is contrary to his testimony, in which he describes being "employed as a neurologist," "what you would call a neuro-hospitalist" who takes "care of patients that are sick in the hospital with neurologic issues." RP (June 2, 2022) at 867. He also describes that he

> graduated from college in 1984. Went immediately to medical school. That was four years. [He] finished medical school in 1988. [He] then did a family medicine residency. [He] did that for three years. . . . [He] went to Europe for three years and worked as a family doctor. Then in 1994, [] came back to the United States and did a second residency in neurology. [He] finished that in 1997, and [he has] been a full-time neurologist since that time.

RP (June 2, 2022) at 828. Herndon's assertion is in direct contradiction with sworn testimony, and not found in the record.

28

In SAG 6, Herndon says he "feels as though the law was broken by the state" to obtain evidence for his case. SAG at 4. Specifically, in regards to phone calls that Herndon asserts were "chopped and cut" to favor the State, and that he has transcripts of the calls that should have been shown to the jury. SAG at 5. These transcripts are not part of the record, and neither is support for the assertion that the phone calls were altered. This is a matter outside the record and we decline to address it.

### C. Alleged Witness Perjury

Herndon asserts in SAG 1 that witness Ron Smith committed perjury at trial. We do not address issues of witness credibility on appeal and instead defer to the jury's measure of witness credibility and resolution of conflicting testimony. *Thorgerson*, 172 Wn.2d at 443. "Whether a witness testifies truthfully is an issue entirely within the province of the trier of fact." *Id.* Because the jury had a full opportunity to consider each witness's testimony, we decline to address these claims.

### D. Prosecutorial Misconduct

In SAG 7, Herndon claims the prosecutor committed misconduct by saying: "For assault in the second degree, it doesn't have to be an intentional or an intent to inflict substantial bodily harm." RP (June 2, 2022) at 907.

To prevail on a prosecutorial misconduct claim, the defendant bears the "significant burden" of showing that the prosecutor's conduct was both improper and prejudicial in the context of the entire record. *See Thorgerson*, 172 Wn.2d at 455. This was not a misstatement of the relevant law. The prosecutor went on to explain that "[t]he bodily harm has to be—a substantial bodily harm that is, need only be inflicted recklessly." RP (June 2, 2022) at 907. This accurately explains RCW 9A.36.021, which states: "A person is guilty of assault in the second degree if he

or she . . . (a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm." The record does not reflect that the prosecutor misstated the law, and the court should reject this claim.

E.       DNA[9] Testing of Smith's Shovel

Finally, in SAG 2, Herndon argues that to prove his case, the State should have had the entire shaft of the shovel tested for DNA, not just the blade, to demonstrate assault against him. Herndon argues that he was assaulted with the shaft of the shovel, not the blade. Assuming without deciding that failure to do so was in error, it would have been harmless. Had Herndon's DNA been present on the shaft of the shovel, it would not have made a difference in light of all of the other evidence at trial, particularly the footage the jury was shown demonstrating exactly what occurred.

VII.    CRIME VICTIM PENALTY ASSESSMENT

Herndon argues that the $500 CVPA should be stricken due to a recent change in the law. The State does not object to a remand for the trial court to strike the CVPA.

While Herndon's appeal was pending, the legislature amended former RCW 7.68.035(1)(a) to prohibit courts from imposing a CVPA on defendant's who are indigent under RCW 10.01.160(3). This statutory amendment applies to Herndon because it took effect while his appeal was pending. *State v. Ramirez*, 191 Wn.2d 732, 748- 49, 426 P.3d 714 (2018); *State v. Blank*, 131 Wn.2d 230, 249, 930 P.2d 1213 (1997). The State concedes that this case should be remanded for the court to strike the CVPA. We remand for the trial court to strike the CVPA.

---

[9] Deoxyribonucleic acid

CONCLUSION

We affirm Herndon's felony murder in the second degree conviction and sentence but remand for the trial court to strike the CVPA.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J.

We concur:

_____
Maxa, J.

_____
Glasgow, J.